# IN THE COURT OF APPEALS OF IOWA

No. 17-0976
Filed July 18, 2018

**EXTREME AUTO PLAZA, INC.,**
    Plaintiff-Appellant,

**vs.**

**IOWA DEPARTMENT OF TRANSPORTATION, OFFICE OF VEHICLE AND MOTOR CARRIER SERVICES,**
    Defendant-Appellee.

_____

Appeal from the Iowa District Court for Polk County, Paul D. Scott, Judge.

A motor vehicle dealership, which held licenses to sell and recycle automobiles, appeals from the district court ruling affirming the agency's decision to revoke both licenses for one year. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Robert A. Nading II of Nading Law Firm, Ankeny, for appellant.

Thomas J. Miller, Attorney General, and Michelle E. Rabe, Assistant Attorney General, for appellee.

Considered by Vaitheswaran, P.J., and Potterfield and Tabor, JJ.

**POTTERFIELD, Judge.**

Extreme Auto Plaza, Inc. (Extreme)[1] appeals from the district court ruling affirming the decision of the Iowa Department of Transportation (DOT) revoking its motor vehicle dealership's licenses to sell and recycle automobiles for one year.

**I. Background Facts and Proceedings.**

In June 2014, the DOT performed an audit of Extreme's business after receiving a consumer complaint alleging Extreme failed to disclose to a purchaser that the purchased vehicle had a previous salvage title.

In performing an audit of forty of Extreme's files regarding sales of vehicles, the DOT determined Extreme had overcharged the buyer for registration fees on nine of the sales. Based on this finding, the DOT applied for and received a search warrant and then seized Extreme's files for sales made between January 2013 and May 2014. After reviewing the files, the DOT found 122 buyers had been overcharged for registration fees by Extreme, totaling an amount more than $11,000. In some cases, buyers had also been undercharged, with those amounts totaling approximately $1450.

Additionally, in reviewing Extreme's records, the DOT noted a number of vehicles for which Extreme had applied for and received a "clear," non-salvage title by checking the box on the front of the title application form for a "regular title." Additionally, when Extreme later signed those vehicles over to its purchasers, Extreme certified "no"—again by checking a box on the form—when presented with the following statement: "I have knowledge the motor vehicle is now or was

---

[1] Extreme is owned and operated by Paul Moyer. We ascribe any actions taken by Moyer or his employees to Extreme.

previously titled as salvage, rebuilt or flood in this state or any other state."
However, on sales contracts for the same vehicles, Extreme included handwritten notes stating the new buyer understood the vehicle had been a total loss to someone else and having the purchaser sign next to the statement.

As a result of these discoveries, the DOT sent a letter to Extreme in December 2014 notifying it that its motor vehicle dealer and recycler licenses were being revoked for one year, starting December 31, 2014. According to the letter, the revocations were based upon:

- The motor vehicle dealer has demonstrated a pattern of obtaining clear Iowa certificates of title for vehicles known to salvage or have damage greater than 50 percent of their value by making false statements or knowingly concealing material facts on title applications, which constitute violations of Iowa Code § 321.97 [(2014)] and are fraudulent practices.
- Vehicles with similar salvage and damage history continue to be offered for sale by the motor vehicle dealer with clear Iowa certificates of title.
- The motor vehicle dealer has overcharged consumers for vehicle registration fees as a routine course of business.

Additionally, the DOT demanded Extreme "immediately remove from its sales inventory all vehicles that have a salvage history or current or previous damage greater than 50 percent of their value, for which the dealer possesses clear Iowa certificates of title" and threatened Extreme with an injunction if it did not comply.

Extreme responded with an affidavit stating it had identified fourteen vehicles "that fail to conform with the notice" from the DOT, which Extreme was "in process of changing clear title to salvage title." Additionally, Extreme contested the revocation by requesting an evidentiary hearing in front of an administrative law judge.

*First Hearing:*

The administrative hearing took place in July 2015 with testimony and exhibits presented by both parties. At the hearing, Extreme stated it was challenging both the DOT's finding of violations and the DOT's chosen punishment of revocation, as the DOT had other, less severe options such as suspension. However, Extreme conceded that people had been overcharged registration fees. Extreme appeared to focus on contesting whether the violations had been intentional or accidental. Additionally, after the execution of the search warrant, Extreme refunded the customers the amount they were overcharged and provided receipts to the DOT to show that it had done so.

*Agency Decisions and Remand:*

In August, the administrative law judge (ALJ) who heard the case issued a proposed decision, which affirmed the DOT's findings of violations and sustained the decision to impose a one-year revocation of Extreme's licenses. In reaching its decision, the ruling recited the following conclusions of law:

> Iowa Code § 322.9 provides that the Department may revoke or suspend the license of a retail motor vehicle dealer if, after notice and hearing by the department of inspections and appeals, it finds that the licensee has been guilty of an act which would be ground for the denial of a license under Iowa Code § 322.6. That section authorizes the Department to deny an application for a dealer's license if the applicant has not complied with provisions of chapter 322 or rules adopted by the Department pursuant to Chapter 322, or if the applicant is about to engage in a fraudulent practice or other indictable offense in connection with selling or other activity relating to motor vehicles. Iowa Code § 322.6(1)(b), (e).
> Iowa Code § 321H.6 provides that a recycler license may be revoked if the Department finds the licensee has made any material misrepresentation to the Department in connection with an application for a license, junking certificate, salvage certificate, certificate of title, or registration of a vehicle. Iowa Code § 321H.6(2).
> Iowa Code § 321.52 governs out of state sales and wrecked or salvaged vehicle. When a wrecked or salvage vehicle is repaired, an application can be made for regular title. A wrecked or salvage

vehicle is defined as a vehicle for which the cost of repair exceeds fifty percent of the fair market value. Disclosure of the vehicle's history must be made and the resulting title and registration will be designated as a prior salvage vehicle thereafter. Iowa Code § 321.52(4)(b), (d).

Iowa Code § 321.105 requires the payment of annual registration fees for vehicles operated on the public highways. The annual registration fee is to be paid to the county treasurer at the time the application for registration is made. If the registration fee amount collected by a motor vehicle dealer exceeds the required fee, the dealer must return the excess to the purchaser. Iowa Code § 321.105(1), (2), (5).

In its proposed decision, the ALJ went on to find:

There is little dispute that [Extreme] failed to properly disclose vehicle prior history on multiple title applications when the damage information was readily available. The Department's exhibits contain numerous examples of such vehicles. Moreover, [Extreme] has admitted that nearly [it's] entire inventory is obtained via online insurance auctions which move salvaged vehicles almost exclusively. To indicate [it] is unaware of any prior damage history on a salvage vehicle is clearly a misrepresentation. These misrepresentations resulted in the issuance of clean titles rather than prior salvage titles at the eventual detriment of the purchasers. Following the issuance of the Department's notice of revocation, [Extreme] identified 14 salvage vehicles on [it's] lot that improperly held clean titles.

Similarly, there is no dispute that [Extreme] failed to utilize the online fee estimator, or to place a phone call to the county treasurer's office to properly determine registration fees, led to a significant amount of incorrect charges. [Extreme] had admitted [it] simply guessed the fee amount, presumably for years, until audited by the Department in June of 2014. The subsequent investigation confirmed consumers were overcharged approximately $11,000 and undercharged $2000 in just one year of business. There is no way to assure that refunds were properly issued by [Extreme] prior to June 2014 as no records were maintained and payments were purportedly made only in cash.

Extreme appealed the ALJ's proposed decision.

In October 2015, the reviewing officer of the DOT affirmed the proposed decision. In reaching the decision, the reviewing officer noted that while Extreme claimed it had always refunded customers when mistakes in estimating

registration fees occurred, Extreme had provided no documentation to support the claim. Additionally, the reviewer noted a "greater concern" in "the evidence supplied by the [DOT] regarding clean titles issued by the appellant on salvaged titles—a clear violation of section 321H.6." The reviewer concluded that Extreme "never established a reasonable explanation for these actions." Because the "overriding purpose of chapter 322 is to protect consumers of motor vehicles from fraud and deception," and the one-year revocation "is a measured response to the voluminous violations committed by" Extreme, the reviewer agreed the one-year revocation was not too severe.

Extreme then filed a petition for judicial review and a request for an order staying the revocations of its licenses pending the outcome of the appeal. The district court denied Extreme's motion to stay.

Before the court ruled on Extreme's petition for judicial review, in February 2016, Extreme filed an application with the district court asking the court to remand the matter to the ALJ to hear additional evidence that had not been presented during the contested case hearing. In its application, Extreme claimed—among other things—the DOT had purposely interfered with Extreme's ability to testify at the administrative hearing by having caused Extreme to be served with six criminal complaints at the same time the civil, agency case was proceeding. The DOT resisted the application. The district court granted the application, ruling:

> The facts and circumstances of this case are somewhat unusual with the civil administrative matter proceeding at the same time as the criminal matter regarding the same underlying factual situation. While the court does not necessarily agree with [Extreme's] characterization of the intent and/or motive of the [DOT] in these

matters, the court finds that the application to present additional evidence is meritorious. The court finds that the additional evidence is material and there were good reasons for failure to present it in the contested case proceeding before the agency. . . .

IT IS ORDERED that this matter be remanded to the agency to allow additional evidence be taken before the agency. The evidence shall include, but is not limited to, . . . the specific information regarding each vehicle the DOT alleges was illegally titled to be provided by the DOT, including the NADA[2] value before it was damaged, and the cost to repair.

*The Second Hearing*:

Additional evidence and argument were presented on remand to the same ALJ on May 4, 2016—at which time Extreme's license had been revoked for approximately half of its one-year revocation. Counsel for Extreme opened the hearing with an argument that explained about how the words "salvage" or "wrecked" have a specific legal meaning within the context of titling vehicles. He argued that words or descriptions had been used too freely during the initial hearing to describe vehicles that may not have met the legal definitions. Pursuant to the DOT's administrative rule 761-405.6, a wrecked or salvage vehicle is a damaged motor vehicle that "(1) had repair costs exceeding 50 percent of its fair market value before it had become damaged, and (2) had a fair market value of $500 or more before it became damaged." The "fair market value" is "the average retail value found in the National Automobile Dealers Association (NADA) Official Used Car Guide." Counsel for Extreme also asserted a number of errors in the initial ruling by the ALJ, including the finding that Extreme "failed to properly disclose vehicle prior history on multiple title applications when the damage information was readily available." As the executive officer of the DOT, Tim Allen,

---

[2] NADA refers to the National Automobile Dealers Association Official Used Car Guide.

conceded, there is not a place on the title application to indicate whether the vehicle has suffered any prior damage, vehicle history, or values. Rather, the person applying for the title simply marks either the "regular title" box or the "salvage title" box. It is on the back of the title, once the vehicle is being signed over to the new buyer, that the seller—here, Extreme—must mark whether the vehicle has ever been titled as a salvage vehicle or has sustained "damage for which the cost of repair exceeded 50% of the fair market value before it became damaged." The only option provided by the DOT form is to mark "yes" or "no."

Similarly, the initial ruling stated Extreme had "admitted that nearly [it's] entire inventory is obtained via online insurance auctions which move salvaged vehicles almost exclusively." In fact, Extreme admitted that it purchased most of its inventory through online auctions, which were often stocked with vehicles from insurance companies and most of those vehicles had some damage. Extreme did not admit it purchased vehicles at the online auctions that had damages greater than 50% of the NADA value of the vehicle before the damage occurred or that had been titled as salvage in another state.

During its testimony at the second hearing, Extreme claimed it had not improperly applied for a regular title on a single salvage vehicle. In that testimony, Extreme contradicted its previous affidavit listing fourteen vehicles that it retitled as salvage in response to the December 2014 revocation letter warning Extreme that if it did "not immediately remove from its sales inventory all vehicles that have a salvage history or previous damage greater than 50 percent of their value, for which the dealer possesses clear Iowa certificates of title, an injunction [would] be filed." Extreme testified that it knew at the time those vehicles were retitled to

salvage titles that their damage did not meet the 50% threshold but that it retitled them anyway because of the "threatening letter." Extreme reasoned, "So I thought if I go down and salvage these, I can continue in business. If I don't, they're just going to shut me down and worry about the record later."

At the second hearing, Extreme provided exhibits relating to each of the thirty-six vehicles the DOT had identified at the first hearing as improperly titled, including a spreadsheet providing certain identifying information about each vehicle, its "clean retail" NADA value, the costs Extreme had incurred in repairing the vehicle, and the resulting percentage of the NADA value represented by the costs of repair. According to Extreme's calculations, the highest damage percentage on any vehicle was 40%. Extreme's records of the repair costs were handwritten on note cards. Extreme testified that the cards were kept as a normal part of business and were in the file on each of the cars when the DOT seized its records—suggesting the cards were created before there was any reason to be anything but accurate. Additionally, Extreme testified that it used the records in order to determine its net profits on each vehicle, asserting there would be no reason to underestimate or undervalue the costs of repairs because then the amount of profit—an amount Extreme had to pay taxes on—would be skewed high. Extreme testified that it advised buyers when a vehicle had been a total loss to someone else in order to ensure that the buyer was aware that a vehicle history may show that an insurance company had deemed that vehicle a "total loss." While the DOT argued it was common sense that the insurance company would not declare a vehicle a "total loss" if the damages did not exceed the value of the vehicle—thus meeting the 50% threshold for a wrecked vehicle in Iowa—Extreme

testified about instances where an insurance company would deem a stolen vehicle a total loss (because the insurance customer would be compensated for the vehicle), and then later sell the non-damaged vehicle when it was located. Moreover, the term "total loss" is not a term used in the titling of vehicles in Iowa.

Additionally, at the second hearing, the DOT advanced a new interpretation of section 321.52(4)(a); the section states, in part:

> A vehicle rebuilder or a person engaged in the business of buying, selling, or exchanging vehicles of a type required to be registered in this state, upon acquisition of a wrecked or salvage vehicle, shall surrender the certificate of title or manufacturer's or importer's statement of origin properly assigned, together with an application for a salvage certificate of title, to the county treasurer of the county of residence of the purchaser or transferee within thirty days after the date of assignment of the certificate of title for the wrecked or salvage motor vehicle. This subsection applies only to vehicles with a fair market value of five hundred dollars or more, based on the value before the vehicle became wrecked or salvage. . . . A vehicle on which ownership has transferred to an insurer of the vehicle as a result of a settlement with the owner of the vehicle arising out of damage to, or unrecovered theft of, the vehicle shall be deemed to be a wrecked or salvage vehicle and the insurer shall comply with this subsection to obtain a salvage certificate of title within thirty days after the date of assignment of the certificate of title of the vehicle.

The DOT claimed that the statute provided two situations in which it was necessary to title a vehicle with a salvage title. The first was the situation both parties acknowledged—where the damage of the vehicle exceeded 50% of the NADA value of the vehicle before the damage. The second situation first introduced at the second hearing by Allen during his testimony involved vehicles bought by a recycler or dealer from outside of Iowa that was titled in an insurance company's name. The DOT conceded that the language of the statute speaks specifically to insurers when it states, "A vehicle on which ownership has

transferred to an insurer of the vehicle as a result of a settlement with the owner of the vehicle arising out of damage to, or unrecovered theft of, the vehicle shall be deemed to be a wrecked or salvage vehicle *and the insurer* shall comply with this subsection to obtain a salvage certificate of title . . ."  (Emphasis added.) However, executive officer Allen testified:

> In [section 321.]52 it breaks out insurers to include them in requiring them to get a salvage title.  It doesn't say that only insurers are required to get that salvage title.
> We take the position that if dealers are allowed to circumvent the process, the whole point of 321.52 unravels.  If you say to a dealer, "You can bring a wrecked car into the state," just because it has a clear title, but it's clearly a wrecked vehicle, and obtained a clear Iowa title, you're doing an injustice to the consumers.

The DOT also challenged Extreme's calculation of the percent of damage its vehicles had sustained.  While the administrative rule requires the use of the "average retail value found in the" NADA, the NADA does not provide any "average retail" category.  Instead, a "low," "average," and "high" value is given under the category "auction"; a "rough," "average," and "clean" value is given under "trade-in"; and then there is a "clean loan" and a "clean retail" value.  The "clean retail" value—the value which Extreme used in all of its calculations—is the category with the greatest values.  The DOT agreed that the administrative rule did not provide any guidance as to which category of the NADA was to be relied upon, but it contested whether Extreme's use of the "clean retail" value for each of the vehicles was the appropriate value.  Additionally, the DOT contested Extreme's use of its actual repair costs, as the DOT maintained Extreme was getting parts at wholesale value and was receiving discounts on the repair work that was completed.  Extreme testified it "get[s] a little bit of a break on the parts" but maintained it was

paying full price at the repair shops for the work being completed. The DOT's evidence that Extreme was not paying the same repair costs as the average consumer was based on a comparison with estimates used by insurance companies to determine that vehicle was a total loss. Most, if not all, of these estimates from insurance companies were based on repair costs in another market and state, such as Dallas, Texas. The administrative rule is silent as to how repair costs should be determined. Still, the DOT maintained comparing a "clean retail" NADA value to Extreme's minimal "wholesale" repair costs did not provide an accurate result when determining if the damage to the vehicle met the 50% threshold. Rather, the DOT maintained that the retail estimate of repair costs was the appropriate figure to compare to the vehicle's average retail value.

*Second Agency Decisions:*

In the second proposed ruling, filed in July 2016, the ALJ noted:

> The individual vehicle files contained in DOT's Exhibit A are not well organized. Additionally, they contain a mix of documents taken from Extreme's sales files, and documents gathered from other sources during the course of the investigation. Some vehicle files have more information than others. A review of every file in Exhibit A identified five files that contain specific value and repair estimates from an insurance company.

When the ALJ compared Extreme's reported repair costs with those insurance company's estimated repair costs, it found the difference "striking" and "so vast that their reliability is necessarily in question." The ALJ continued:

> Extreme now contends that a clean retail NADA value, and [Extreme's] reported actual repair costs, are the only appropriate figures to use when determining if these vehicles were salvage. This argument is not persuasive. In fact, Mr. Moyer did not use either of those figures when he made the determination. The statute requires an application for certificate of title be filed within thirty days of the date of assignment. Iowa Code §321.52(4)(a). It is clear from the

vehicle files in Exhibit A[3] that Extreme routinely applied for and secured an Iowa certificate of title in far less than 30 days. Mr. Moyer acknowledged at hearing that the cars were often not repaired prior to obtaining an Iowa title, and he relied on his own estimate for the repair costs. This is consistent with the statute which allows the owner to apply for a *regular* certificate of title after the vehicle *has been repaired* and passes a salvage theft examination. *See* Iowa Code § 321.52(4)(b). Mr. Moyer also relied on his own estimate for fair market value. He testified he does not need to look up the NADA value, or use any other source regarding repair costs for making the determination to apply for a regular or salvage title. His own estimates for these figures are based on his personal guess from looking at the cars.

This calculation is important. If the repair costs exceed 50% of the fair market value of the vehicle prior to damage, Extreme *must* apply for a salvage title pursuant to Iowa Code section 321.52(4)(a), (d). The figures that Extreme now argues must be used lead to a less than 50% damage result for all thirty-six vehicles in Exhibit A. This includes at least two vehicles that entered Iowa with a salvage title from another state. Mr. Moyer testified at hearing that all of the vehicles in Exhibit A came to Iowa with a regular title. This is not accurate according to the documentation in evidence. Exhibit A, p. 829 contains a copy of a salvage title from the state of Missouri for a 2013 Volkswagen Jetta, and the final settlement statement showing Extreme purchased the vehicle via Copart Auto Auction on April 11, 2014. Extreme contends that this vehicle was not salvage, and its repair costs were only 19% of its prior damage value. These results do not make sense. Mr. Moyer's testimony is not consistent with other evidence in the record. He has not submitted any documentation verifying the accuracy of his reported repair costs. As the owner of Extreme, he clearly has an interest in maintaining licensure. His repair costs are dramatically less than other available estimates, and lead to a "non-salvage" result in every instance. As a result, Mr. Moyer's testimony, and his reported repair costs at Exhibit 40, lack credibility.

The DOT's position that Mr. Moyer's reported repair costs grossly understate what a *retail* cost of repairs would be is clearly bolstered by the comparison of Moyer's costs to the insurance company repair estimates. This type of retail repair cost estimate is relied upon in section 321.52(4)(b) for the determination of damages following theft. It is not unreasonable to give them weight in this context as well. The applicable statute and rule require the use of an average *retail* value when determining fair market value, it follows

---

[3] Exhibit A is the DOT's 941-page exhibit from the first hearing, which includes identifying and supportive information that Extreme improperly titled thirty-six vehicles with a regular title instead of a salvage one.

that a *retail* repair cost should also be used. Mr. Moyer's reported repair costs appear to be of a wholesale nature, rather than retail. He acknowledged at hearing that he is given a break on the cost of parts from auto shops. It is unclear from the index card notations if labor costs have been included. Additionally, it is unclear whether Moyer's repairs actually returned the vehicles to their condition prior to damage. Moyer testified at hearing, for example, that he has declined to repair hail damage if he considers it to be light.

An Iowa title application requires an applicant to indicate if they are seeking a regular or salvage certificate of title. By failing to apply for a salvage certificate of title when repair costs exceed 50% of the fair market value of the vehicle prior to damage, Extreme obtained a regular Iowa certificate of title that did not properly disclose prior damage. The back side of the certificate of title asks if the vehicle was previously titled as salvage. If the answer is no, it then asks if the owner has knowledge of the vehicle sustaining damage for which the cost of repair exceeded 50% of the fair market value before it became damaged. The same questions are asked again on the Iowa damage disclosure statement which is filled out when the vehicle is sold. Extreme applied for a regular certificate of title for all of the vehicles in Exhibit A, and did not disclose prior damage for which the cost of repair exceeded 50% of the fair market value before it became damaged on any of the certificates or damage disclosure statements.

In December 2014, Extreme identified fourteen vehicles on its sales lot with titles that failed to comply with Iowa law. Mr. Moyer submitted an affidavit attesting to this and reporting he would have all of the vehicles properly titled as salvaged vehicles. The affidavit and list of vehicles were submitted at the July 2015 hearing, as evidence of Mr. Moyer's willingness to cooperate with the DOT and fix violations. Mr. Moyer subsequently testified at the May 4, 2016 hearing that his sworn affidavit was actually false, and all fourteen of the listed vehicles were not salvage. He contends he changed the titles on these vehicles and submitted the affidavit solely to avoid the DOT seeking an injunction. Mr. Moyer's explanation makes little sense. He was represented by counsel at the time the affidavit was submitted and was in the process of appealing the DOT license revocation. The notion that he falsely identified fourteen examples of his failure to comply with Iowa law to avoid further legal challenges from the DOT is not believable and I give it no weight.

(Citations to the record omitted.)

The ALJ determined Extreme had improperly applied for regular titles when

it should have applied for salvage titles. In making this determination, the ALJ

relied upon the retail costs of repairs and either the "clean retail" or "clean trade-in" value—either value resulted in damage exceeding 50%.

Next, the ALJ acknowledged section 321.52(4)(a) on its face only places an obligation on Iowa insurance companies, it found persuasive the DOT's contention that the statute also placed an obligation on licensed dealers and recyclers to obtain a salvage certificate of title when they purchase a vehicle with a foreign title held by an out-of-state insurance company. In reaching this conclusion, the ALJ relied on a decision by our supreme court, *Mulder v. Iowa Department of Transportation*, 565 N.W.2d 348, 350 (Iowa 1997), in which the court discussed that the legislative intent of section 321.52 was to "ensure that consumers were informed about any significant damage and/or prior salvage designations which a vehicle might have had."

Finally, the ALJ noted that Extreme had admitted it overcharged customers registration fees. While Extreme claimed it had paid customers back the overage in the instances the customers noticed and requested it even before the execution of the search warrant, Extreme had no receipts to support this assertion. It was undisputed that after the search warrant was executed, Extreme paid each of the 122 customers back with a check and provided the receipts to the DOT. Based on all of the foregoing, the ALJ concluded:

> Extreme has a duty as a licensee to comply with the law. [Extreme] has been in the car business for decades, and should be well aware of the requirements. [It] has been directed by the Department in the past to fix problems and has apparently done so. Yet, problems persist. These violations support a significant sanction. After full consideration of the additional evidence submitted at hearing on remand, the sanction previously imposed by DOT is sustained.

Extreme appealed the ALJ's proposed ruling, and the DOT's reviewing officer affirmed, finding Extreme had failed to meet its burden to prove that no customers were overcharged registration fees. Additionally, the review ruling stated:

> On [Extreme's] second request for director review, [Extreme] highlights documentation [it] did supply regarding clean titles on salvaged vehicles. A wrecked or salvage vehicle is a damaged motor vehicle that has repair costs exceeding 50 percent of its fair market value before it became damaged. 761 Iowa Administrative Code 405.6(1)(a). [Extreme] cites to thirty-seven vehicles bought at salvage auctions primarily in 2013-14 that were identified by [the DOT]. According to [Extreme]'s Exhibit 40, every one of the vehicles show a repair cost between 0 and 40 percent of the fair market value.
>
> The administrative law judge found that this evidence stretched credulity. The manner in which these repair costs were recorded by the appellant is also dubious. There is no substitute for accurate record keeping; amounts for replacement parts scrawled on index cards without supporting receipts and with indiscernible labor costs does not constitute accurate record keeping. Of greatest concern was [Extreme's] questionable practice of applying for clean title well before the vehicle had been repaired. Knowledge of the total repair costs and proof they would be less than half the fair market value could not have existed at that time.
>
> The overriding purpose of Chapter 322 is to protect consumers of motor vehicles from fraud and deception. *State v. Miner*, 331 N.W.2d 683 (Iowa 1983). I believe the conclusions of the administrative law judge are correct and supported by the extensive record that was made. The proposed sanction of a one-year revocation is a reasonable response to the appellant's violations.

Exteme then filed a petition for judicial review.

*Judicial Review Ruling:*

The district court affirmed the agency ruling, finding substantial evidence supported the DOT's findings; that the agency's determinations that the "clean retail" category of the NADA was not the proper category to use pursuant to the "average retail value" language from rule 761-405.6 and that it was more appropriate to utilize the insurance company's estimated repair cost rather than

Extreme's claimed costs. The district court ruled these findings were neither beyond the DOT's authority, an erroneous interpretation, nor reached in an arbitrary and capricious manner; and that the agency acted within its discretion when it decided to impose a one-year revocation instead of a lesser sanction. However, although the issue was raised, the district court did not rule on whether the agency's interpretation of section 321.52(4)(a)—that it applies to dealers and recyclers and requires them to title any vehicle obtained from an out-of-state insurance company as salvage—was in error.

Extreme appeals.

## II. Discussion.

On appeal, Extreme asks us to conclude that that it did not make any fraudulent title applications. In doing so, Extreme challenges both the DOT's interpretation of section 321.52(4)(a) as requiring recyclers and dealers to obtain salvage titles for any vehicles bought from out-of-state insurance companies and the DOT's determination that at least some of the vehicles originally identified by the DOT had more than 50% damage. If Extreme is meritorious in these claims, it asks that we remand back to the DOT to impose a less-severe penalty on the remaining violations (the overcharging of registration fees).

*Standard of Review:*

We begin by considering our role in reviewing this agency action. "The district court functions in an appellate capacity to correct errors of law on the part of the agency." *Willett v. Iowa Dep't of Tranps.*, 572 N.W.2d 172, 173–74 (Iowa Ct. App. 1997). "We review such action by the district court applying the same standard of section [17A.19(10)] to the agency action to determine whether our

conclusions are the same as the district court." *Id.* at 174. Insofar as the DOT's findings of facts are at issue, we are bound by the findings if they are supported by substantial evidence in the record, when the record is viewed as a whole. *Cobb v. Emp't Appeal Bd.*, 506 N.W.2d 445, 447 (Iowa 1993). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an agency's finding from being supported by substantial evidence." *Gordon v. Iowa Dep't of Transp.*, 389 N.W.2d 390, 392 (Iowa 1986). Additionally, it is Extreme that bore the burden to show compliance with all lawful requirements for the retention of its licenses. *See Mary v. Iowa Dep't of Transp.*, 382 N.W.2d 128, 132 (Iowa 1986); *see also* Iowa Code § 17A.18(3) (preventing the "revocation, suspension, annulment, or withdrawal" "of any license" until after "the licensee was given an opportunity to show, in an evidentiary hearing conducted according to the provisions of this chapter for contested cases, compliance with all lawful requirements for the retention of the license").

*Iowa Code section 321.52(4)(a):*

We begin our analysis by considering the agency's determination that section 321.52(4)(a) requires licensed dealers and recyclers to obtain a salvage certificate of title when they purchase a vehicle with a foreign title held by an out-of-state insurance company.[4]  In considering the DOT's interpretation of the

---

[4] While Extreme raised this issue before the district court, the district court did not rule on it. Additionally, although it was included in—and in fact, constituted the main portion of—Extreme's appellate brief, the DOT has not responded to Extreme's argument on appeal. However, we decide the issue as it was properly raised before and decided upon by the agency. *See Staff Mgmt. v. Jimenez*, 839 N.W.2d 640, 647 (Iowa 2013) (stating error-preservation rules are different for administrative law cases; the court has "held a party preserves error on an issue before an agency if a party raises the issue in the agency proceeding before the agency issues a final decision and both sides have had an opportunity to address the issue"); *Chauffeurs, Teamsters, & Helpers, Local Union No.*

statute, we do not give the agency deference, as normally "the interpretation of a statute is a pure question of law over which agencies are not delegated any special powers by the General Assembly, so, a court is free to, and usually does, substitute its judgment *de novo* for that of the agency." *Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 11 (Iowa 2010) (citation omitted). Here, the enabling statute does not expressly vest in the agency the right to interpret laws. *See* Iowa Code § 307.12 (listing the duties of the director of the department of transportation); c*f. Renda*, 784 N.W.2d at 11 (noting that the enabling statute for the Iowa Department of Education does explicitly grant the department the power to interpret school laws and rules relating to school laws). Additionally, while the DOT has been given rulemaking authority, *see* Iowa Code § 307.12(1)(n), "we have not concluded that a grant of mere rulemaking authority gives an agency the authority to interpret *all* statutory language." *Renda*, 784 N.W.2d at 13. Moreover, the issue here— whether the term "insurer," as used in section 321.52(4)(a) is also meant to encompass all recyclers and dealers—involves language that has "specialized legal meaning and [is] widely used in areas of law other than the" department of transportation arena. *Id.* at 14. Thus, we are not convinced the legislature intended to vest the DOT with the authority to interpret the term insurer, and we review for correction of errors at law. *See* Iowa Code § 17A.19(10)(c).

When interpreting statutory provisions, we utilize the well-established rules of statutory construction. *Id.* at 15. "It is of course true that where the language

---

*238 v. Iowa Civ. Rts. Comm'n*, 394 N.W.2d 375, 382 (Iowa 1986) (finding error must be preserved at the agency level, not on judicial review in the district court); *Brewbaker v. State Bd. of Regents*, 843 N.W.2d 466, 471 (Iowa Ct. App. 2013) ("To preserve an issue on appeal, the party must first argue the issue before the agency.").

chosen by the legislature is unambiguous, we enforce a statute as written."
*Rhoades v. State*, 880 N.W.2d 431, 446 (Iowa 2016). "A statute is ambiguous if reasonable minds differ or are uncertain as to the meaning of the statute." *Id.* Neither here nor before the ALJ did the DOT claim that the term "insurer" as used in section 321.52(4)(a) could reasonably be understood to mean insurers, recyclers, and dealers. Rather, the DOT focused on the legislative intent of the statute, arguing that because the legislature meant for the statute to ensure that customers were informed about any prior damage, the statute must be applied more broadly than written. *See Mulder*, 565 N.W.2d at 350. But we do not consider the purpose of a statute when the language is unambiguous. *See McGill v. Fish*, 790 N.W.2d 113, 118 (Iowa 2010) ("We do not search for legislative intent beyond the express language of a statute when that language is plain and the meaning is clear. . . . We only apply the rules of statutory construction when the statutory terms are ambiguous.").

The agency was in error when it interpreted section 321.52(4)(a) to require Extreme, as a dealer and a recycler, to title any vehicle obtained from an out-of-state insurance company as salvage. Thus, we limit the scope of our review to the question whether Extreme improperly applied for regular titles when the vehicle had sustained damage for which the cost of the repair exceeds 50% of the fair market value, pursuant to the NADA.

After the second hearing, when the ALJ was provided the NADA information for each of the vehicles the DOT claimed were improperly titled, the ALJ identified five vehicles on which Extreme had improperly applied for a regular title. Extreme maintains this determination was in error, as the ALJ relied on the insurance

company's estimate of repair costs, which was higher than Extreme's actual costs. But the ALJ found that Extreme's claimed repair costs lacked credibility. In doing so, the ALJ noted that Extreme failed to bring a single receipt to establish that the costs listed on the handwritten note cards were correct. Additionally, because Extreme's numbers were so much lower than those estimated by the insurance companies, the ALJ doubted their veracity. The insurance companies had found the vehicles to be a total loss, while Extreme claimed that four of the vehicles sustained damage 15% or less of the NADA value, with the outlier fifth vehicle having sustained 22% damage. Extreme contends the ALJ could not rely on the estimates of a third party to determine whether the vehicle needed to be titled with a salvage title. First, we note that both the appropriate code section and the administrative rule are silent as to how the "repair cost" is to be determined. Second, we understand the ALJ's use of the estimates as a comparison in determining whether Extreme's estimates were reliable, which we believe is appropriate as Extreme had a motive for being dishonest about its repair costs. Moreover, as the ALJ noted, because Extreme titled the vehicles under a regular title immediately, the vehicles were never inspected to determine that the repairs Extreme made to the vehicles actually fixed the damage the vehicle had sustained. While the DOT did not have a witness who could testify as to what the actual costs of repair would have been for the vehicles in question, Extreme bore the burden of establishing that the vehicles had been properly registered, *see Mary*, 382 N.W.2d at 132, and the ALJ determined Extreme's evidence of such lacked credibility. The DOT's reviewing officer affirmed the ALJ's ruling, adding its own statements about Extreme's credibility. We are not at liberty to reweigh the credibility of the

witnesses and the evidence. *See Christiansen v. Iowa Bd. of Educ. Exam'r*, 831 N.W.2d 179, 192 (Iowa 2013) ("The law is well-settled. It is in the agency's duty 'as the trier of fact to determine the credibility of the witnesses, weigh the evidence, and decide the facts in issue.'" (citation omitted)). Because substantial evidence supports the DOT's determination that Extreme improperly titled five vehicles with regular titles, we affirm the finding of violations in respect to those vehicles.

We recognize the DOT's discretion in determining the appropriate punishment[5] and believe the DOT should be given the opportunity to review whether the imposed punishment is appropriate in light of our conclusion that section 321.52(4)(a) does not require recyclers and dealers to title all vehicles bought from out-of-state insurance companies as salvage, thereby reducing the number of violations the DOT believed Extreme committed.[6] Thus, we remand to the agency for a re-determination of the sanction imposed.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[5] Iowa Code section 322.9 concerns motor vehicle dealers and allows the department to "revoke or suspend the license of a retail motor dealer if, after notice and hearing by the department of inspections and appeals, it finds the licensee has been guilty of an act which would be a ground for the denial of a license under section 322.6." Similarly, Iowa Administrative Code 761-425.62(1) concerns motor vehicle dealers and provides, "The department may deny an application or suspend or revoke a certificate or license if the applicant, certificate holder, or licensee fails to comply with the applicable provisions of this chapter."

Iowa Code section 321H.6 allows the DOT to deny, revoke, or suspend the license of a vehicle recycler to deny the application for the recycler license if the department finds the "licensee has violated any provision of the chapter" or "made any material misrepresentations to the department in connect with an application for a license, junking certificate, salvage certificate, certificate of title, or registration of a vehicle"—among other things.

[6] We note that Extreme has already served its one-year revocation. Still, Extreme has asked us to remand for review by the DOT, as the DOT may use its determination that Extreme failed to comply with the statutory provisions as grounds to deny Extreme's future applications to re-obtain its dealer and recycler licenses.